## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Jesse Ventura,<br>a/k/a James G. Janos, | No. 14-cv-4993 (JNE/FLN) |
|                 Plaintiff, | (Jury Trial Demanded) |
| v. | |
| HarperCollins Publishers, LLC, | |
|                 Defendant. | |

## AMENDED COMPLAINT

Plaintiff Jesse Ventura, a/k/a James G. Janos, for his claims against the defendant, HarperCollins Publishers, LLC, states and alleges that:

### THE PARTIES

1.　　Plaintiff Jesse Ventura, a/k/a, James G. Janos ("Ventura") is an individual citizen and resident of the State of Minnesota.

2.　　Defendant HarperCollins Publishers, LLC ("HarperCollins") is a limited liability company with its corporate headquarters located at 195 Broadway, New York, NY 10007.  HarperCollins is wholly-owned by its sole member, News Corporation.  News Corporation is a Delaware corporation with its principal executive office located at 1211 Avenue of the Americas, New York, NY 10036.  News Corporation and HarperCollins are citizens of the States of Delaware and New York.

**JURISDICTION AND VENUE**

3.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. §
1332(a) because the parties' citizenship is diverse and the amount in controversy exceeds
$75,000, exclusive of interest and costs.

4.     The Court has personal jurisdiction over HarperCollins pursuant to Minn.
Stat. §§ 543.19, subds. 1(2)–(4), and the Due Process Clause of the Fourteenth
Amendment to the United States Constitution, because HarperCollins transacts business
in the State of Minnesota and has committed acts inside and outside of the State of
Minnesota intended to cause and causing injury in this State, including but not limited to
the intentional publication of defamatory statements of and concerning Minnesota
resident Ventura via the sale of books in this State.

5.     Venue in the District of Minnesota is proper pursuant to 28 U.S.C. §
1391(b)(2) because a substantial part of the events giving rise to Ventura's claims
occurred in this district, and pursuant to 28 U.S.C. §1391(c)(2) because, for venue
purposes, a defendant corporation is deemed to reside in any judicial district in which it is
subject to personal jurisdiction at the time the action is commenced.

**FACTS**

*Ventura*

6.     Ventura is the former Governor of the State of Minnesota, having served in
that capacity from 1999 through 2002; the former Mayor of Brooklyn Park, Minnesota,
having served in that capacity from 1990 through 1993; and is also a veteran of the

United States Navy, having served his country as a member of the Naval Special Forces Underwater Demolition / SEAL Teams.

7. Through and as a result of his accomplishments in a career that has spanned more than four decades, Ventura has become well known to the public throughout the United States, and has created for himself a unique public personality and image; and his professional names, "Jesse Ventura" and "Jesse 'the Body' Ventura," as well as his image, voice, photograph, likeness, and public persona, have become commercially valuable commodities.

8. Ventura comes from a military family, is very proud of his and his family's military service, and has nothing but the highest regard for veterans of, and those currently serving in, the United States military.

9. Ventura's service in the Naval Special Forces Underwater Demolition / SEAL Teams was a defining experience in his life, and he has always believed that those with whom he served, as well as those who preceded and followed him, deserve his and the nation's utmost respect and deepest gratitude.

10. Ventura has, over a period of many years, maintained close friendships with his former colleagues in the Naval Special Forces Underwater Demolition / SEAL Teams, and he has on several occasions since his own discharge from the military attended and spoken at Navy SEAL graduation and other ceremonies, where he has always been treated with dignity and respect.

11. Although Ventura has liberally exercised his First Amendment right to criticize government policy, and has been publicly opposed to the war in Iraq, he has

always supported America's troops, and has never, and would never, wish them any harm.

### Chris Kyle and "American Sniper"

12.     In the fall of 2010, Jim DeFelice ("DeFelice") was recruited by HarperCollins editor Peter Hubbard ("Hubbard") to work with first-time author Chris Kyle ("Kyle") to write a non-fiction book about Kyle's career as a Navy SEAL sniper.

13.     Together, Kyle, DeFelice, and a third co-author, Scott McEwen, wrote the book *American Sniper, the Autobiography of the Most Lethal Sniper in U.S. Military History* ("*American Sniper*").

14.     *American Sniper* includes a sub-chapter captioned "*Punching Out Scruff Face*," which at pages 310 through 312 contains a false and defamatory story about an incident involving Ventura.

15.     The *Punching Out Scruff Face* sub-chapter reads, in its entirety, as follows:

AFTER THE FUNERAL WE WENT TO A LOCAL BAR FOR THE WAKE proper.

As always, there were a bunch of different things going on at our favorite nightspot, including a small party for some older SEAL's and UDT members who were celebrating the anniversary of their graduation.  Among them was a celebrity I'll call Scruff Face.

Scruff served in the military; most people seem to believe he was a SEAL.  As far as I know, he was in the service during the Vietnam conflict but not actually in the war.

I was sitting there with Ryan and told him that Scruff was holding court with some of his buddies.

"I'd really like to meet him," Ryan said.

"Sure."  I got up and went over to Scruff and introduced myself.

"Mr. Scruff Face, I have a young SEAL over here who's just come back from Iraq.  He's been injured but he'd really like to meet you."

Well, Scruff kind of blew us off.  Still, Ryan really wanted to meet him, so I brought him over.  Scruff acted like he couldn't be bothered.

*All right.*

We went back over to our side of the bar and had a few more drinks.  In the meantime, Scruff started running his mouth about the war and everything and anything he could connect to it.  President Bush was an asshole.  We were only over there because Bush wanted to show up his father.  We were doing the wrong thing, killing men and women and children and murdering.

And so on.  Scruff said he hates America and that's why he moved to Baja California.  9/11 was a conspiracy.

And on and on some more.

The guys were getting upset.  Finally, I went over and tried to get him to cool it.

"We're all here in mourning," I told him.  "Can you just cool it?  Keep it down."

"You deserve to lose a few," he told me.

Then he bowed up as if to belt me.

I was uncharacteristically level-headed at that moment.

"Look," I told him, "why don't we just step away from each other and go on our way?"

Scruff bowed up again.  This time he swung.

Being level-headed and calm can last only so long.  I laid him out.

Tables flew.  Stuff happened.  Scruff Face ended up on the floor.

I left.

Quickly.

I have no way of knowing for sure, but rumor has it he showed up at the BUD/S graduation with a black eye.

A true and correct copy of *American Sniper*, *the Autobiography of the Most Lethal Sniper in U.S. Military History*, pages 310-312, is attached hereto marked **Exhibit A**.

16.     Kyle never disputed that the quoted passage from *American Sniper*, attached hereto as Exhibit A, was written about Ventura, and it contains matters of description, facts, and circumstances sufficient for readers to infer that Kyle was referring to Ventura, including: the "Scruff Face" reference to his famous facial hair; his status as an "older" "celebrity" former UDT / SEAL who served during the Vietnam war; his winter home in Baja California (Mexico); his opposition to the war in Iraq; the 9/11 "conspiracy" about which he has talked and written; and his having been the speaker at BUD/S graduation ceremonies.

17.     *American Sniper* was written in part based on a series of oral interviews between Kyle and DeFelice, which DeFelice then used to draft the manuscript.

18.     The incident described by Kyle in the *Scruff Face* sub-chapter was described to DeFelice in his 2011 audio-recorded interview with Kyle.

19.     In his 2011 recorded interview with DeFelice, Kyle recounted an alleged incident in which Ventura "got loud about President Bush was an a—hole, we were doing the wrong thing, we're killing men and women and children and murdering and doing all this sh-t . . . and he told me that we deserve to lose a few," "[a]nd then he bowed up, and then [I] knocked him down."

20.     Kyle also told DeFelice during the 2011 recorded interview that: "we were on the sidewalk when I did it"; I "hit [Ventura] in the eye"; Ventura "had at least one, I don't know if it was two black eyes or what the next day . . . he fell backwards and hit his head . . . he fell and hit the sidewalk . . . he didn't get back up"; Kyle ran after he did it because "of course the cops were there"; and I knew Ventura had a black eye because I saw him on TV three or four days later, and because Ventura showed up at the BUD/S Class 258 graduation the next day and "everybody was laughing" and asking "Who beat the sh-t out of him?"

21.     While working on the manuscript, DeFelice spoke with only four people about Kyle's Ventura story:  Chris Kyle; Chris Kyle's wife, Taya Kyle, who was not present when the alleged incident occurred; Chris Kyle's SEAL teammate, Kevin Lacz; and a woman named Debbie Lee, who did not claim to have witnessed the incident.

22.     In his recorded interview with DeFelice, Kevin Lacz's story was that Kyle "choked" Ventura, rather than punching him.  According to Lacz: "No, this is how it happened," "like Kyle is out there choking—he's choking Ventura out . . . And then that was it.  It got broken up.  But I was like, he choked up Ventura."

23.     In his recorded interview with DeFelice, Lacz also claimed that he had heard another version of the story in which Kyle had supposedly broken Ventura's leg.

24.     In his recorded interview with DeFelice, Lacz did not claim that Ventura had told Kyle SEALs "deserve to lose a few."

25.     Aside from Chris Kyle, none of the people that DeFelice spoke with about the Ventura incident prior to publication had reported hearing Ventura say SEALs "deserve to lose a few."

26.     In the first draft manuscript of *American Sniper*, a new detail was added to the story told in Kyle's 2011 recorded interview, which made it appear that Kyle had not assaulted Ventura without provocation, saying instead that Ventura got "decked" only after he had "loaded up to punch [Kyle]."  Omitted was Kyle's claim that he saw Ventura on TV a few days later with a black eye.

27.     In the next iteration of the story, additional details were added that made Kyle appear to be more of a hero, and Ventura appear to look worse.  As the story morphed, it was written that Kyle remained "uncharacteristically level-headed" after Ventura supposedly said "You deserve to lose a few," and Kyle suggested that "we just step away from each other and go on our way," and did not react physically until after Ventura "swung" at him first.  And then, "Tables flew.  Stuff happened.  Jesse ended up on the floor."

28.     Although Ventura's name appeared in early drafts of the book, it was removed from the story prior to publication, with one editorial comment written in the manuscript margin explaining:  "Don't want to use his full name or description.  Was warned of law suit."  The title of the subchapter was correspondingly changed for publication from "Punching out Jesse" to "Punching out Scruff Face."

29.     When HarperCollins editor Peter Hubbard first read the manuscript of *American Sniper*, he commented in the margin, "Great story.  If it was witnessed by

fellow SEALs—thus corroberation [sic] against libel claim—can we mention who it was? Jessie [sic] Ventura, I take it."

30.     Although Hubbard knew prior to publication that the *Scruff Face* sub-chapter was about Ventura, and that it was libelous if not true, neither HarperCollins nor anyone acting on its behalf did any pre-publication due diligence, research, investigation, or fact-checking to determine whether the story was true or false.

31.     Prior to publication, neither co-author DeFelice, HarperCollins, nor anyone acting on its behalf contacted or attempted to contact Ventura or his representatives to ask if the story was true or false.

## The Publication and Promotion of American Sniper

32.     *American Sniper* was released for sale nationally, including in Minnesota, on January 3, 2012, by William Morrow, an imprint of HarperCollins.

33.     Prior to publication of *American Sniper*, Hubbard and others at HarperCollins were of the opinion that a war-themed memoir, written by unknown, first-time author Chris Kyle, would appeal only to a limited market segment.

34.     Consistent with that opinion, Hubbard and HarperCollins publicist Sharon Rosenblum ("Rosenblum") pronounced the book a great success when only a few thousand advance copies were sold.

35.     To promote *American Sniper*, Rosenblum arranged for Kyle to appear on the nationally-satellite broadcast *Opie & Anthony* radio show January 4, 2012, the day after *American Sniper* was released to the public.

36.     During his January 4, 2012, appearance on the *Opie & Anthony* radio show, Kyle was interviewed about the Ventura story that appears in the *Scruff Face* sub-chapter:

> HOST:  There's someone on the line saying that you had—you were in a bar fight with Jesse, Ventura.  Is that true?
>
> HOST:  What.
>
> CHRIS KYLE:  God.
>
> HOST:  It's probably—is it?
>
> CHRIS KYLE:  Yes.
>
> HOST:  Oh, sh___ (expletive deleted).
>
> HOST:  Oh, let's get into this.
>
> HOST:  Yeah, I would like to.
>
> HOST:  Can we talk about it?
>
> HOST:  I was going to ask you how you felt about it, actually.
>
>                          * * *
> HOST:  What happened in the bar?
>
> HOST:  Yeah, what happened?  You were in a bar and --
>
> HOST:  Oh, Jesus.
>
> CHRIS KYLE:  We, ah, we had just come back from our '06 deployment when we lost our guys.  We were having a wake for the guy who got the Medal of Honor, Mikey Mansoor.  And he happened to be there.  He was coming in for a graduating BUDs class that he was going to speak to.  And he was upset with the war.  He doesn't agree with it, which is fine.  I—you don't have to agree with the war.  I just get sent there.  I don't have to agree with politics.  I signed up to serve the country; the country tells me what to do.
>
> HOST:  Uh-huh.

CHRIS KYLE:  But he was making it known that he did not agree with it.  And I approached him and said, "Hey, you know" —

HOST:  It's not the place.

CHRIS KYLE:  — "I appreciate it, but we are having a wake."  It was the SEAL bar there in town.  I said, "We're having the wake here.  The family is here.  I would appreciate it if you'd just kind of keep it down."  He told us that we were killing innocent people over there —

HOST:  Oh, f___  (expletive deleted).

CHRIS KYLE:  — men, women and children.  That we were murderers.  And, you know, I said, "You know what, we can all have our differences, that's–that's fine; but, please, just don't upset the family."

HOST:  Yeah.

CHRIS KYLE:  And then he said that, you know, we deserve to lose a few guys.

HOST:  Holy sh__ (expletive deleted).

HOST:  Jesse said that?

CHRIS KYLE:  Yes.

HOST:  What the f___ (expletive deleted) is wrong with him.

HOST:  So, by the way, all you guys out there that attacked me because I f___ ing (expletive deleted) attacked him, good, I'm glad to hear that.  He really is a douche.  And what happened when he said that to you?

CHRIS KYLE:  I punched him.

HOST:  Did you grab his ponytail?

CHRIS KYLE:  No, I punched him.

HOST:  You slugged him?  Good.

HOST:  "I punched him."

HOST:  "I punched him."

HOST:  Good for you.

HOST:  Where did you punch him?

HOST:  Bravo.

CHRIS KYLE:  In the face.

HOST:  What happened?

HOST:  That's when you take a head shot.

CHRIS KYLE:  I mean, Jesse Ventura, he's —

HOST:  Big man.

CHRIS KYLE:  — he's an older guy, too.

HOST:  Yeah, he's an older guy.

CHRIS KYLE:  Of course all the guys then started making fun of me.  "So what geriatric" (inaudible) — (Laughter.)

HOST:  Wait.  When you hit him, did he hit you back, or...

CHRIS KYLE:  No, he—he went down.

HOST:  Oh —

HOST:  Like out?  Like was he like —

CHRIS KYLE:  I don't think he was out.  It definitely took him off balance.  He went down and —

HOST:  But the ref wasn't looking.  They never are.

HOST:  Did his walker fall with him?

CHRIS KYLE:  Yeah, I think he fell out of his wheelchair.

HOST:  Wow.  Wow.  He went down.

HOST:  You hit a big dude.  He's a—he's still Jesse the Body.  I mean, he's an older guy, but he's still a big strong guy.

HOST:  Did he awkwardly get up and have to walk out of the place?

CHRIS KYLE:  I don't know.  I took off running, because the cops were already outside.  And as soon as I hit him, I knew, SEAL party, SEAL bar, cops were watching, they saw the whole thing happen.  So I took off running.

HOST:  Oh, yeah.  So Jesse Ventura said to a SEAL at a bar where there was a wake for a SEAL:  "You deserve to lose a few guys"?

HOST:  Yeah.

CHRIS KYLE:  Yes, he did.

A true and correct copy of a transcript of Kyle's January 4, 2012, interview on the *Opie & Anthony* radio show as it later appeared on

http://www.youtube.com/watch?v=PBJWI0UBwWU is attached hereto marked **Exhibit B**.

37.    Rosenblum was present for the January 4, 2012, *Opie & Anthony* interview, and she later referred to the interview as a "hit."

38.    The day after Kyle's appearance on the *Opie & Anthony* radio show, the book rose to number 21 on Amazon's best-seller list.

39.    Hubbard wrote in an e-mail that the publicity from the Ventura story was "priceless," and Rosenblum characterized the Ventura story as "hot hot hot."

40.    Rosenblum arranged for Kyle to appear on FOX TV's *The O'Reilly Factor* the next day, January 5, 2012.

41.     In the lead segment of Kyle's interview on *The O'Reilly Factor*, Kyle

participated in the following exchange with the show's host Bill O'Reilly:

> MR. O'REILLY:  Personal story segment tonight:  Chief Chris Kyle, a Navy SEAL, is officially the most lethal sniper in U.S. military history.  The Chief has written a brand new book called American Sniper, that chronicles his amazing story in Iraq.  I spoke with him last night.  Very entertaining.  I recommend it for my audience.  I think they'll like it.  First of all, you say you knocked Jesse Ventura to the floor with a punch.  Now, you don't mention his name, but everybody knows who that is.  Number one, that—that happened?  You knocked him out?

> MR. KYLE:  Well, I knocked him down.

> MR. O'REILLY:  Knocked him down.  Why?  Why would you punch Ventura?

> MR. KYLE:  It was in '06.  Was the year we lost our first two SEALS in Iraq.  We came home.  We lost our last guy just before coming home.  We had the wake in a SEAL bar there in Coronado.  And he was there.  He was there for a speaking engagement at a BUD ceremony, graduating class—

> MR. O'REILLY:  Because he was a SEAL, right?

> MR. KYLE:  Yes, sir.

> MR. O'REILLY:  He was a Navy SEAL.  So he was badmouthing the war, right?

> MR. KYLE:  Badmouthing the war, badmouthing Bush, badmouthing America.

> MR. O'REILLY:  And you took exception?

> MR. KYLE:  I did find a problem with it.  The family was there.  I asked him to please tone it down, that we did not want to upset the family members of Mikey Mansoor.

> MR. O'REILLY:  Who was killed?

> MR. KYLE:  Yes, sir.  And he earned the Medal of Honor.  He jumped on a grenade and saved everybody else around.

> MR. O'REILLY:  But I want to be clear.  Ventura wasn't attacking him at all, verbally bashing him; he was just bashing the whole thing in general?

MR. KYLE:  Yes, sir.

MR. O'REILLY:  All right.

MR. KYLE:  Until he said we deserve to lose a few guys.

MR. O'REILLY:  He said we deserve to—we, the United States—

MR. KYLE:  No.  He said, "You, y'all, deserve to lose a few guys."

MR. O'REILLY:  Navy SEALS.

MR. KYLE:  I—I'm assuming.  He was saying that to me.

MR. O'REILLY:  Was he drunk?

MR. KYLE:  No, sir.  I never saw him with a drink in hand at all.

MR. O'REILLY:  So once he said, "You deserve to lose a few guys," you popped him?

MR. KYLE:  Yes, sir.

MR. O'REILLY:  Did he fight back?

MR. KYLE:  He went down.  The cops were there, I took off running.

MR. O'REILLY:  You ran?

MR. KYLE:  Yes, sir.

MR. O'REILLY:  Did they arrest you?

MR. KYLE:  No, sir.  I—I have a master chief that always said, "Punch and run."

\* \* \*

A true and correct copy of a transcript of Kyle's January 5, 2012, interview on *The O'Reilly Factor* as it later appeared on http://video.foxnews.com/v/1368298701001 is attached hereto marked **Exhibit C**.

42.     Rosenblum was present during Kyle's January 5, 2012, appearance on *The O'Reilly Factor*.

43.     At the time that Kyle appeared on *The O'Reilly Factor*, the FOX Television Network and HarperCollins were both owned by the same parent company, News Corporation.

44.     On January 6, 2012, the day after Kyle's appearance on *The O'Reilly Factor*, *American Sniper* rose to No. 2 on Amazon's best-seller list, and HarperCollins ordered 100,000 reprints of the book.  The reprints included the false and defamatory story about Ventura.

45.     Within days of Kyle's appearance on *The O'Reilly Factor*, *American Sniper* became a No. 1 bestseller on Amazon and B&N.

46.     Following Kyle's O*pie & Anthony* and *O'Reilly* appearances, the Ventura story dominated media coverage of *American Sniper*.

47.     In order to take advantage of the publicity generated by Kyle's Ventura story, HarperCollins provided its institutional customers with links to the *Opie & Anthony* and *O'Reilly* interviews, and to related news stories that included titles like "Navy Seal Punched Out Jesse Ventura."

48.     HarperCollins also actively marketed the book by leveraging Ventura's name in connection with Internet search engine optimization tools and on social media.

49.     Within days of *American Sniper*'s release, Ventura publicly stated that Kyle's story about him was false.

50.     Although HarperCollins was aware that Ventura had publicly labeled Kyle's story false, it made no attempt to investigate the veracity of Kyle's story, and instead continued to use the false and defamatory story about Ventura as a marketing tool.

51.     During the week of January 9, 2012, Kyle's appearance on *The O'Reilly Factor* was discussed on *The Five*, a FOX News commentary show, and the show's five hosts all agreed, among themselves, that Kyle was telling the truth about the comments he attributes to Ventura and the incident during which he allegedly punched Ventura. A true and correct copy of a transcript of the *circa* January 9, 2012, *The Five* broadcast, as it later appeared on http://www.youtube.com/watch?v=f4P2fzR9dcA, is attached hereto marked **Exhibit D**.

52.     Rosenblum arranged for Kyle to appear on the *Opie & Anthony* radio show for the second time, which appearance took place on January 10, 2012.

53.     During Kyle's January 10, 2012, appearance on *Opie & Anthony*, Kyle participated in the following exchange with the show's hosts:

> HOST:  What exactly happened, Chris?  If you could just refresh, because a lot of people might not have heard you on that moment.  Just if you could give us a brief—just kind of sum the story up so people know what we're talking about.
>
> MR. KYLE:  It was the wake for Mikey Mansoor, and of course all the families were there.  He was there.  He started getting loud and voicing his opinion coming out against the war and the troops and everything.  So we asked him to keep it down.  And he got belligerent about it, and finally said we deserve to lose a few.
>
> * * *
>
> HOST:  Now, Chris, is it possible that you and Jesse were arguing or you were debating and he said something to the effect of it's only natural you're going to

- 17 -

lose a few?  Are you 100 percent sure that he said it and with the intention that you heard it?

MR. KYLE:  No.  I feel that (inaudible) he said exactly what I thought I heard. Them other guys that were standing right there—

HOST:  Oh, they heard it as well?

MR. KYLE:  —exact same way.

\* \* \*

HOST: Chris, there's no doubt in your mind you punched Jesse Ventura that day, right?

MR. KYLE:  Yes, sir, definitely.

A true and correct copy of a transcript of Kyle's January 10, 2012, interview on the *Opie & Anthony* radio show as it later appeared on http://www.theblaze.com/stories/radio-host-confronts-seal-sniper-over-ventura-bar-brawl-story-and-reveals-psy-ops-theory/, is attached hereto marked **Exhibit E**.

54.	By January 22, 2012, and while news outlets were continuing to run with the Ventura story, *American Sniper* hit No. 1 on the New York Times Bestseller List, where it remained for weeks.

55.	Rosenblum commented that *American Sniper*'s sales during this time period were "astonishing."

56.	On January 23, 2012, Ventura filed suit against Kyle in the Hennepin County, Minnesota, District Court seeking damages for defamation, appropriation of name and likeness, and unjust enrichment.  Kyle's attorneys subsequently removed the

case to the United States District Court for the District of Minnesota, Civil No. 12-0472 (RHK/SER) (the "Defamation Action").

57.     On February 2, 2013, Kyle was shot and killed at a shooting range in Texas, and his Estate was substituted as the defendant in the Defamation Action.

58.     In October 2013—more than a year and one-half after Ventura had filed suit and long after he had produced photographs and other evidence to prove that the incident described in the *Scruff Face* subchapter never happened—HarperCollins published a Memorial Edition of *American Sniper* which included the false and defamatory story about Ventura.

59.     At the time that HarperCollins published the Memorial Edition of *American Sniper*, HarperCollins was aware of the evidence that Ventura had produced proving that the incident described in the *Scruff Face* subchapter was fabricated.

60.     Rosenblum booked Taya Kyle, Chris Kyle's widow, on a media tour to publicize the new release, during which Taya Kyle was asked about and commented on the Ventura story.

### The July 2014 Trial

61.     Beginning on July 8, 2014, Ventura's Defamation Action against the Estate of Chris Kyle (the "Estate") was tried simultaneously to a jury and to the Court.  Hubbard and Rosenblum both testified for, and HarperCollins' insurer participated in and funded, the defense.

62.     Rosenblum's trial testimony during the Defamation Action established that the Ventura story and resulting controversy and publicity were largely responsible for the book's success.

63.     Hubbard testified during the Defamation Action that the book had sold more than 1.5 million copies as of July 2014.

64.     On July 29, 2014, the jury returned a verdict against the Estate in the Defamation Action, awarding Ventura $500,000 for defamation, and returned an advisory verdict against the Estate, awarding Ventura $1,345.477.25 for unjust enrichment.

65.     In finding that Ventura had proven his claim for defamation, the jury in the Defamation Action determined that the story about Ventura—published in the *Scruff Face* sub-chapter and recounted by Kyle in subsequent publicity interviews—was false and defamatory, and that Kyle either knew the story was false or acted with reckless disregard for the truth.

66.     On August 7, 2014, the trial court entered its judgment in the Defamation Action in Ventura's favor and against the Estate, adopting the jury's advisory verdict as its own.

67.     In adopting the jury's advisory verdict on Ventura's claim for unjust enrichment, the Defamation Action trial court found that the evidence supported the jury's conclusion that Kyle had been unjustly enriched by his defamatory story about Ventura, and that the jury's damages award represented a reasonable portion of the Estate's total profits from *American Sniper*.  According to the court:

Given how much media attention the Ventura story garnered and how book sales sky-rocketed after select media appearances in which Kyle recounted and discussed the Ventura story, the jury's conclusion that Kyle was unjustly enriched by his story about Ventura was supported by a preponderance of the evidence. Likewise, its award of $1,345,477.25 was a reasonable portion (approximately 25%) of Chris Kyle's and his Estate's total profits to date and was supported by substantial evidence.

68.     On November 26, 2014, the Defamation Action trial court issued a Memorandum Opinion and Order denying the Estate's Motion for Judgment as a Matter of Law or New Trial.

69.     In its November 26, 2014, Order, the Defamation Action trial court held that Ventura had proven that Kyle's story was false, not only by a preponderance of the evidence, but also under the heightened clear-and-convincing standard.  According to the court:

Defendant also argues Plaintiff was required to prove falsity by clear-and-convincing evidence. . . .  But she acknowledges that neither the Supreme Court nor the Eighth Circuit (nor any Minnesota court) has ever imposed that burden on a public figure such as Plaintiff. . . .  Regardless, in the Court's view the evidence here, viewed in the light most favorable to the verdict, . . . was sufficient to prove falsity by this higher standard. Defendant contends Plaintiff failed to surmount this hurdle because clear-and-convincing evidence requires something more "than one man's word against another['s]," . . . but far more was presented here. Indeed, several witnesses testified consistently with Plaintiff, and other evidence—such as the absence of obvious injury in photographs taken after the incident—supports Plaintiff's version of events.

70.     The Defamation Action trial court's November 26, 2014, Order also affirmed once again that Ventura's award for unjust enrichment was appropriate because Kyle and his Estate had directly benefited from the defamatory statements contained in *American Sniper*.  According to the court:

- 21 -

Plaintiff's defamation claim provided him with no means to obtain the disgorgement of Defendant's ill-gotten gains—money the jury found, and the Court agreed, that Defendant made by defaming Plaintiff in <u>American Sniper</u>. Only through unjust enrichment could Plaintiff attempt to force Defendant to yield those improper profits. Under these circumstances, Plaintiff's legal remedy was inadequate to fully ameliorate Defendant's wrongful conduct, and the defamation claim did not preclude the unjust-enrichment claim as a matter of law.

71.     Even after Ventura successfully proved in federal court that Kyle's story was false and defamatory, copies of *American Sniper* containing the *Scruff Face* sub-chapter continued to be sold throughout the country, including in Minnesota, and HarperCollins continued to profit from those sales.

## CLAIMS FOR RELIEF

### COUNT I
### UNJUST ENRICHMENT

72.     Ventura restates and adopts the allegations above.

73.     It has been conclusively determined in the Defamation Action that the story about Ventura in *American Sniper* is false and defamatory.

74.     HarperCollins, by virtue of being in contractual privity with Kyle and participating in and funding his defense of the Defamation Action through a common insurer, is estopped to deny that the story about Ventura in *American Sniper* is false and defamatory.

75.     HarperCollins published a false and defamatory story about Ventura, and subsequently used that story to promote *American Sniper* for its own economic advantage and gain.

76.     HarperCollins published and promoted the false and defamatory story about Ventura either knowing it to be false, or with reckless disregard for the truth.

77.     The publicity and controversy generated by the false and defamatory story about Ventura substantially increased sales of *American Sniper*, thereby generating millions of dollars in revenues and profits for HarperCollins.

78.     As a direct result of its publication and promotion of the false and defamatory story about Ventura, HarperCollins has been unjustly enriched at Ventura's expense in an amount in excess of $75,000.

79.     Equity requires that HarperCollins make restitution to Ventura for all property and benefits unjustly received, including but not limited to revenues and profits from the sale of *American Sniper* books and/or any subsidiary or ancillary rights sales.

**COUNT II**
**MISAPPROPRIATION OF NAME AND LIKENESS**
**(Appropriation Branch of Right of Privacy)**

80.     Ventura restates and adopts the allegations above.

81.     Ventura has acquired a property right in the exclusive commercial use of his own identity, as represented by his name, image, voice, likeness, photograph, and public persona.

82.     Without consent, HarperCollins unlawfully appropriated and used Ventura's identity for its own economic advantage and gain, including Ventura's name, image, and public persona.

83.     HarperCollins is liable to Ventura for wrongful appropriation of his identity in an amount in excess of $75,000 to be determined by the trier of fact.

**WHEREFORE**, the plaintiff, Jesse Ventura, a/k/a James G. Janos, prays that the Court:

(c)     Enter judgment in his favor and against Defendant HarperCollins on Count I of the Complaint for Unjust Enrichment in an amount greater than $75,000 and ordering restitution for all property and benefits unjustly received;

(b)     Enter judgment in his favor and against Defendant HarperCollins on Count II of the Complaint for Misappropriation of Name and Likeness in an amount in excess of $75,000;

(c)     Award his costs and disbursements and attorneys' fees incurred herein; and

(d)     Award all other relief which the Court deems to be just and equitable.

## JURY TRIAL DEMAND

Ventura demands a trial by jury for all claims so triable.

**HENSON & EFRON, P.A.**

Dated:  January 6, 2014.       By:  _/s/ David Bradley Olsen_

David Bradley Olsen, 197944
Court J. Anderson, 331570
John N. Bisanz, Jr., 0389098
Benjamin J. Hamborg, 0395401
dolsen@hensonefron.com
canderson@hensonefron.com
jbisanz@hensonefron.com
bhamborg@hensonefron.com
220 South Sixth Street, Suite 1800
Minneapolis, Minnesota  55402-4503
Telephone:  612-339-2500
Facsimile:  612-339-6364
Attorneys for Plaintiff Jesse Ventura,
  a/k/a James G. Janos

- 24 -